**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, Edwin Woo, being sworn, state:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2. I am a Detective with the Braintree Police Department, where I have been employed since 2013. Since 2019, I have been assigned to the Financial Investigations Team of the New England Field Division of the Drug Enforcement Administration ("DEA") as a Task Force Officer ("TFO"). I am a graduate of the MBTA Transit Police Academy.

3. As a Braintree Police Detective and a DEA TFO, I am authorized to investigate violations of the law of the United States, including violations of federal drug and money laundering offenses. I have received training regarding narcotics investigations while attending the police academy and have attended additional specialized training courses in furtherance of my past and current assignments, including the Basic Narcotic Investigation course conducted and presented by the DEA training staff.

4. I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through

my training and experience, I have become familiar with the manners in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.

5. Based on my training and experience, I am also aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, and use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information) in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

## PURPOSE OF THE AFFIDAVIT

6. I submit this affidavit in support of a criminal complaint, charging Jean Pierre CASTRO-NOVOA, a/k/a "Jay" ("CASTRO-NOVOA") with distribution of and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §841.

7. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that CASTRO-NOVOA has committed the above-described controlled substance offense. All times set forth herein are approximate.

## PROBABLE CAUSE

### *Summary of Investigation*

8.   On May 20, 2021, the Honorable Marianne B. Bowler, United States Magistrate Judge, District of Massachusetts, issued a warrant authorizing the collection of location data for a cellular phone used by CASTRO-NOVOA. The affidavit submitted in support of the May 20 warrant is incorporated herein by reference (the "May 20 Affidavit").

9.   In 2019, the DEA began an undercover investigation into a money laundering organization ("MLO") that collects drug proceeds from locations throughout the world and then launders those funds on behalf of drug trafficking organizations ("DTOs"). DTOs based in drug source countries, such as Colombia and Mexico, use illicit money brokers to collect proceeds from the sale of controlled substances in countries where their drugs have been distributed. The money brokers place "contracts" out to money launderers located throughout the United States and elsewhere for the purpose of collecting drug proceeds, which are then laundered and repatriated to DTOs in the source country. The illicit contracts are for specific amounts and the launderers who accept the contracts are responsible for collecting the drug proceeds and then laundering it. The launderers charge commissions for their services, which is a percentage of the total amount that is laundered. The MLO members and DTO members are known to exchange the serial numbers of dollar bills prior to scheduled money pickups. The purpose of exchanging serial numbers is to ensure that the person picking up the drug proceeds is the correct person. After a contract is accepted, a contact phone number of the courier who is delivering the money is provided to facilitate the meeting for the money pickup. As part of this investigation, undercover agents ("UCs") have posed as money launderers who are willing and able to collect drug proceeds and then launder those proceeds for the DTOs.

### CASTRO-NOVOA coordinated two money pickups in New Zealand.

10. In March 2019, a UC ("UC-1") accepted a contract to pick up and launder $700,000[1] in New Zealand dollars. The contract had been placed by a Colombia-based money broker. UC-1 was given a serial number for a bill and a phone number to call to coordinate the pickup. UC-1 called the phone number and spoke with a male later identified as CASTRO-NOVOA. CASTRO-NOVOA exchanged the serial number with UC-1 and coordinated with UC-1 a time and location for the money pickup to occur. After the money pickup occurred in New Zealand, investigators wired the money to various accounts that had been provided by the MLO for which CASTRO-NOVOA worked. After this meeting, CASTRO-NOVOA and UC-1 kept in contact by phone, using the mobile application WhatsApp.[2]

11. In July 2020, CASTRO-NOVOA sent UC-1 a WhatsApp message notifying him about another large money pickup in New Zealand. UC-1 and CASTRO-NOVOA had numerous conversations to coordinate the money exchange. In August 2020, one of CASTRO-NOVOA's associates delivered $150,090 in New Zealand currency ($92,920 U.S. currency exchange amount) to a UC in New Zealand. After the pickup, UC-1 met CASTRO-NOVOA in Connecticut and gave CASTRO-NOVOA $85,500 in U.S. currency, which was the converted rate and minus UC-1's commission. During that meeting, CASTRO-NOVOA told UC-1 that the associate who delivered the $150,090 to the UC in New Zealand worked for him selling methamphetamine in Australia, which they obtained from Thailand. CASTRO-NOVOA asked if UC-1 was able to pay out money

---

[1] The amount ultimately changed to $200,250 New Zealand dollars, which converted to $134,586 in United States currency.

[2] WhatsApp is a mobile cellular application that allows users to place calls and send encrypted text messages to other subscribers.

in Mexico, noting that he would need to pay money in Culiacan in the future. CASTRO-NOVOA also talked to UC-1 about UC-1's interest in purchasing cocaine.

12.  Since 2019, UC-1 has had numerous phone contacts with CASTRO-NOVOA, during which UC-1 learned that CASTRO-NOVOA was also trafficking drugs, specifically cocaine (which he referred to using the code word "pepe").[3] CASTRO-NOVOA indicated that he could supply UC-1 with kilogram quantities of cocaine. All of the calls and text message communications have been recorded and preserved. As detailed below, CASTRO-NOVOA and UC-1 used the code words "cars" or "vehicles" to refer to the kilograms of cocaine.

March 2021: CASTRO-NOVOA delivered cocaine to an undercover officer.

13.  On March 15, 2021, CASTRO-NOVOA sent a message to UC-1 over Whatsapp. Using coded language, CASTRO-NOVOA told UC-1 that he had an associate located in New London, Connecticut who was doing well selling cocaine, but that the prices for cocaine were high. UC-1 asked the price for a kilogram of cocaine ("white cars") and CASTRO-NOVOA replied the kilograms were $39,000 a piece ("39"). UC-1 told CASTRO-NOVOA that he had a customer who wanted to purchase kilograms of cocaine ("cars") and asked if CASTRO-NOVOA's supplier could reduce the price. CASTRO-NOVOA said he believed the price was negotiable if the customer purchased a "couple" (of kilograms). UC-1 said his customer wanted to purchase "five" (meaning five kilograms) but that UC-1 told the customer to start with "one or two" at first to see if the quality of the cocaine ("cars") was good. CASTRO-NOVOA said he would personally deliver the cocaine to UC-1's customer.

---

[3] My interpretations of the coded language used in the described conversations and communications is based on my training and experience and knowledge of the investigation.

14. On March 22, 2021, CASTRO-NOVOA sent UC-1 a message asking how things were going. UC-1 replied that his customer was interested in purchasing "two to three" (kilograms) to start. CASTRO-NOVOA said he had a "half ready" (meaning, a half kilogram of cocaine) if the customer was interested. UC-1 said he would extend the offer to his customer. In a call later that day, UC-1 told CASTRO-NOVOA that his customer wanted to purchase the half kilogram. UC-1 said he told the customer the price was $40,000 per kilogram ("40") and that the customer would pay $20,000 ("20") for the half kilogram. UC-1 said he and CASTRO-NOVOA would each make $500 ("500") on the deal. UC-1 asked if the deal could happen the following day, and CASTRO-NOVOA affirmed, saying his "associate" was in the area near UC-1. Later that day, UC-1 again called and spoke with CASTRO-NOVOA. UC-1 said that he told his customer the price would be $19,500 for the half kilogram, but that UC-1 did not mind if he did not make a profit from the first sale because he wanted CASTRO-NOVOA and the customer to develop a business relationship.

15. On March 23, 2021, UC-1 sent a message to CASTRO-NOVOA to set up the drug transaction the following day at a location in Framingham, Massachusetts. On March 24, 2021, UC-1 sent the location information to CASTRO-NOVOA and reported that the customer could meet CASTRO-NOVOA at 1:00 p.m. At 12:48 p.m., CASTRO-NOVOA sent UC-1 a message indicating he was at the meeting location. Shortly after 1:00 p.m., UC-1 arrived at the meeting location in Framingham. CASTRO-NOVOA got out of a black Mercedes Benz carrying a black satchel bag, walked towards UC-1's vehicle, and got into the vehicle. An unidentified Hispanic male remained in the Mercedes. When asked, CASTRO-NOVOA told UC-1 that the Hispanic male was with him. UC-1 asked if the Hispanic male had the "thing" (meaning, the half kilogram of cocaine), and CASTRO-NOVOA replied that the cocaine was in his satchel bag. CASTRO-NOVOA opened the satchel bag and pulled out a clear Ziploc bag containing a large piece of an

off-white substance wrapped in clear plastic. UC-1 asked if the quality of the cocaine was good and if it had been "mixed" with anything else. CASTRO-NOVOA assured UC-1 the quality was fine and that the customer could "cook it" (meaning, into crack cocaine) if he wanted to do so.

16.     UC-1 then called a second UC ("UC-2"), who was posing as the customer who was purchasing the cocaine. UC-2, accompanied by a third UC ("UC-3"), got into UC-1's car with UC-1 and CASTRO-NOVOA. CASTRO-NOVOA handed UC-2 the Ziplock bag containing the suspected cocaine,[4] and in return, UC-2 handed CASTRO-NOVOA an envelope containing $19,500. CASTRO-NOVOA asked UC-2 how much was in the envelope, and UC-2 replied, "Nineteen five."

17.     CASTRO-NOVOA told UC-2 that his associates were "active" and were local. CASTRO-NOVOA told UC-2 to call UC-1 if he (UC-2) was interested in purchasing larger quantities. UC-2 told CASTRO-NOVOA he wanted to purchase between five and ten kilograms every two weeks but would need time to pay. CASTRO-NOVOA replied that the total amount had to be paid at the time of delivery. UC-2 asked CASTRO-NOVOA if he could purchase "five" (kilograms) and pay for "four" upfront. UC-1 vouched for UC-2 and agreed to be responsible for the remaining payment if UC-2 failed to pay. CASTRO-NOVOA agreed, and again told UC-2 to contact UC-1 when he was ready to purchase the additional kilograms. CASTRO-NOVOA said his supplier did not have the five kilograms on hand at that time, and he needed to coordinate with the supplier to secure the kilograms.

---

[4] The appearance of the substance was consistent with cocaine. Investigators conducted a field-test, which was positive for the presence of cocaine. The suspected cocaine was sent to the DEA laboratory for analysis, and those results are pending.

18. After the March 24 controlled purchase of cocaine, UC-1 and CASTRO-NOVOA have had several conversations via telephone to coordinate UC-1's purchase of additional kilograms of cocaine. On March 25, 2021, CASTRO-NOVOA called UC-1. UC-1 told CASTRO-NOVOA that his customer (*i.e.,* UC-2) remained interested in purchasing more "vehicles" (meaning kilograms of cocaine). UC-1 told CASTRO-NOVOA he would be in touch when the customer was ready to make the additional purchase.

19. On April 6, 2021, the UC-1 contacted CASTRO-NOVOA and told CASTRO-NOVOA that his purported customer (UC-2) was ready to buy five kilograms of cocaine and that UC-2 would pay for three kilograms at the time of delivery and the remaining balance a couple of days later. CASTRO-NOVOA said that he would talk to his supplier and get back to UC-1. Later, CASTRO-NOVOA told UC-1 that his supplier was going to Florida on vacation for two weeks, but that he could sell the UC-1 three kilograms before he left. UC-1 later informed CASTRO-NOVOA that his customer would wait until CASTRO-NOVOA's supplier returned and could supply the entire five kilograms.

20. On or about April 29, 2021, CASTRO-NOVOA contacted UC-1. CASTRO-NOVOA told UC-1 that his supplier had retuned and that the "vehicles" were available. UC-1 understood CASTRO-NOVOA's use of the word "vehicles" to be code for the five kilograms of cocaine that they had previously discussed. UC-1 told CASTRO-NOVOA that he would let his customer (UC-2) know about the cocaine and would contact CASTRO-NOVOA later. The following day, UC-1 advised CASTRO-NOVOA that his customer had obtained "vehicles" (meaning, cocaine) from another source but that UC-1 would contact CASTRO-NOVOA when the customer was ready to purchase more cocaine.

21.     On May 18, 2021, UC-1 sent CASTRO-NOVOA a message informing him that his customer was ready to purchase some "vehicles." UC-1 told CASTRO-NOVOA his customer wanted to purchase "five" (meaning five kilograms of cocaine) and would pay for three of the kilograms upfront and then pay the balance for the remaining two kilograms two days later. UC-1 further stated that his customer wanted to purchase the cocaine on May 26, 2021. CASTRO-NOVOA acknowledged and said he would speak to his supplier and get back to UC-1 to arrange the purchase.

22.     On May 19, 2021, CASTRO-NOVOA sent a message to UC-1 confirming he could deliver the five kilograms of cocaine to UC-1's customer on May 26, 2021. UC-1 replied that he would let the customer know.

<u>MAY 2021: CASTRO-NOVOA delivered cocaine to an undercover agent.</u>

23.     On May 26, 2021, CASTRO-NOVOA met UC-1 at a location in Framingham, Massachusetts. CASTRO-NOVOA got into UC-1's vehicle and showed him the contents of a box, which contained three brick shaped packages wrapped in black tape and a heat-sealed clear plastic bag, which contained a white powder substance. When asked about the quantities (specifically, why only four kilograms as opposed to five, which was negotiated) CASTRO-NOVOA explained that he could supply UC-1 with four additional kilograms on Saturday. After the exchange, investigators arrested CASTRO-NOVOA. The contents of the packages provided by CASTRO-NOVOA field tested positive for cocaine. The suspected cocaine will be sent to the DEA laboratory for analysis.

24.     Based on the foregoing, there is probable cause to believe that CASTRO-NOVOA has committed a controlled substance offense, specifically, the distribution of and possession with intent to distribute cocaine, in violation of 21 U.S.C. §841.

I, Edwin Woo, hereby state under penalty of perjury that the contents of this affidavit are true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

_____
Edwin Woo, Task Force Officer
Drug Enforcement Administration

Sworn before me by telephone in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 this 27th day of May 2021.

_____
HON. MARIANNE B. BOWLER
United States Magistrate Judge